Note.—See under (1) 29 Cyc. p. 621; 38 Cyc. p. 1547. (2) 38 Cyc. p. 1566; 26 R. C. L. p. 1067; 3 R. C. L. Supp. p. 1491; 4 R. C. L. Supp. p. 1694; 5 R. C. L. Supp. p. 1483.

## TURMAN OIL CO. v. SAPULPA REFINING CO. et al.

No. 16729—Opinion Filed Sept. 21, 1926.

Rehearing Denied March 22, 1927.

**1. Oil and Gas—Contract for Sale of Future Oil Production—Termination of Contract by Changed Conditions Rendering Price Undeterminable.**

Plaintiff and defendants entered into a written contract for the sale by plaintiff to defendants of all oil produced from certain leases, for a period of one year, to be paid for at the posted market price, on the day the oil was run, paid by the Prairie Oil & Gas Company for "Mid-Continent crude." At the time the contract was made the Prairie Oil & Gas Company was, and for eleven years had been, posting a single market price for all "Mid-Continent crude" without regard to gravity of the oil. While the contract was in force the Prairie Oil & Gas Company changed its method of price fixing and graded all "Mid-Continent crude" into seven grades, according to gravity, with a separate price for each grade, and ceased posting a single price for all "Mid-Continent crude." Held, the contract ended when the Prairie Oil & Gas Company ceased posting a single price for "Mid-Continent crude," for the reason that the price to be paid cannot be determined from the contract.

**2. Same.**

The contract provided that on account of the gravity of the oil a premium of 35 cents per barrel above the posted price was to be paid. Held, plaintiff cannot, in a suit on the contract, recover the premium above the posted price for oil of like gravity for oil delivered after the price fixing method was changed.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Tulsa County; Edwin R. McNeill, Judge.

Action by Turman Oil Company against Sapulpa Refining Company and the Aetna Casualty & Surety Company. Judgment for defendants, and plaintiff appeals. Affirmed.

McGuire & Marshall and C. E. Cooper, for plaintiff in error.

George L. Mann and Thompson & Smith for defendants in error.

Opinion by RAY, C. November 22, 1921

he Turman Oil Company and the Sapulpa Refining Company entered into two written contracts, by which it was agreed that the oil company would sell and deliver into the refining company's pipe lines, and the refining company would buy, all the crude oil produced on the Loman and Thompson leases for a period of one year beginning December 1, 1922, for which the refining company agreed to pay the posted market price per barrel, on the day it was run, paid by the Prairie Oil & Gas Company for "Mid-Continent crude," and in addition thereto a premium of 35 cents per barrel. At the time the contracts were made the Prairie Oil & Gas Company was, and had been for more than 11 years, posting a single price for all "Mid-Continent crude," without regard to gravity of the oil. The contracts were carried out by the parties in all particulars until November 22, 1922, when the Prairie Oil & Gas Company graded oil produced in the Mid-Continent field into seven grades according to gravity, with separate prices posted for each grade, and ceased the practice of posting a single price for "Mid-Continent crude." The refining company then claimed that the contracts were at an end, upon the ground that the method of determining the price to be paid, specified in the contract, had failed, and it was no longer possible to determine from the contracts the price to be paid. The oil company claimed that, under the contract, it was entitled to the Prairie Oil & Gas Company's posted price for oil of like gravity and the premium of 35 cents per barrel. It was then agreed that the refining company should continue to take the oil run from the two leases for the balance of the year, and pay the posted price of the Prairie Company for oil of like gravity, and the oil company would accept the payment, without prejudice to the rights and contentions of either as to whether the oil company was entitled, under the contract, to the 35 cents per barrel premium. The latter agreement was carried out, and the Turman Oil Company brought this suit against the Sapulpa Refining Company and the Aetna Casualty & Surety Company, its surety, to recover the premium of 35 cents per barrel for the oil delivered between November 22 and December 31, 1922, inclusive, amounting to $6.314.75, and interest, alleged to be due and payable according to the terms of the contracts. Judgment was for defendants, and plaintiff has appealed.

This case was submitted to the trial court upon an agreed statement of facts, the material parts of which are as follows:

"(2) That the words 'Mid-Continent crude' * * * constitute a term used generally among producers, sellers, buyers and refiners of oil in Oklahoma, Kansas, and northern Texas, to designate oil produced from the oil fields in Kansas, Oklahoma, and north Texas, except the Healdton and Cement fields, and that said words were so used and understood among producers, sellers, buyers, and refiners of oil in said territory at the time the contract sued upon herein was made and for a number of years prior thereto.

"(3) That oil produced from the oil fields in Kansas, Oklahoma, and north Texas, other than the Healdton and Cement fields, and designated as 'Mid-Continent crude' varied in gravity from below 28 to about 41.

"(4) That from April, 1900, the Prairie Oil & Gas Company's market quotations on crude oil produced and bought by it in the states of Kansas and Oklahoma, then constituting the Mid-Continent field, to and until July 16, 1903, were made and posted without regard to gravity of the oil offered it for purchase, and that a single market price was quoted for all oil produced in said field. That upon July 16, 1903, and thereafter, oil market quotations were made by it on oil produced in the Mid-Continent field, and designated as 'Mid-Continent crude,' and offered it for purchase with separate price quotations for each field designated according to the following schedule and table, to wit:

| South Neodesha. | | North Neodesha. | | Heavy. | Bartlesville. | |
| --- | --- | --- | --- | --- | --- | --- |
| * | * | * | * | * | * | * |
| * | * | * | * | * | * | * |

"That on June 30, 1909, the schedule of prices on the basis of grade and gravity of oil, immediately above described, was discontinued, and thereafter market quotations were posted by the Prairie Oil & Gas Company for crude oil produced in the Mid-Continent field and designated as 'Mid-Continent crude' on the basis of the following table and schedule, to wit:

| 1909. | Light Oil 30 and Up. | Below 30 Fuel Oil. | |
| --- | --- | --- | --- |
| * | * | * | * |
| * | * | * | * |

"That upon September 20, 1910, the above and foregoing schedule of prices upon grades and gravities of oil as therein specified was discontinued, and the Prairie Oil & Gas Company posted a single market price for crude oil purchased from the Mid-Continent field, and designated as 'Mid-Continent crude' up to November 21, 1922, without regard to gravity of oil offered it for purchase except that from October 1, 1921, to November 21, 1922, oil produced in the fields of the state of Texas and to which the Prairie Oil & Gas Company ran

its pipe lines, was separately quoted and posted at a constant price of 25 cents per barrel above the remainder of Mid-Continent crude oil. That since November 22, 1922, the Prairie Oil & Gas Company has graded oil produced in the Mid-Continent field, embracing the states of Oklahoma, Kansas, and Texas, and designated as 'Mid-Continent crude,' other than Cement and Healdton fields, into seven grades, according to gravity, with separate prices posted for each grade in the manner indicated and according to the following schedule of gravities and prices, which continued from November 22, 1922, until January 1, 1923, and which said schedule was in effect during the time covered by the matters involved in plaintiff's suit herein, said schedule being as follows:

### November 22, 1922

| | |
|---|---|
| Below 28 | .90 |
| 29 to 29.9 | 1.00 |
| 30 to 32.9 | 1.10 |
| 33 to 34.9 | 1.25 |
| 35 to 36.9 | 1.40 |
| 37 to 38.9 | 1.60 |
| 39 and above | 1.80 |

"That immediately before November 22, 1922, and on November 21, 1922, the single price posted by Prairie Oil & Gas Company for Mid-Continent crude was $1.25 per barrel.

"(5) It is further agreed that defendant Sapulpa Refining Company has paid no premium to the plaintiff for any oil taken by it from the lands described in the petition of the plaintiff since November 22, 1922, but since said 22nd day of November, 1922, and up to and including December 31, 1922, defendant Sapulpa Refining Company took and received from the leases of plaintiff, described in its petition, the number of barrels of oil of the gravity set forth and particularly described in Exhibits 'D' and 'E' attached to the plaintiff's petition, and it is agreed that the number of barrels of oil, the gravity thereof, and the amount paid by Sapulpa Refining Company therefor, is correctly and truly described by said Exhibits 'D' and 'E.' That since November 22, 1922, and up to and including December 31, 1922, defendant Sapulpa Refining Company paid to plaintiff for the oil so taken by it the price posted by the Prairie Oil & Gas Company for oil of the grade of such oil taken by Sapulpa Refining Company from the leases belonging to plaintiff, as described in plaintiff's petition (6) * * *

"(7) It is further agreed that Sapulpa Refining Company, one of the defendants herein, was at the time mentioned and referred to in the plaintiff's said petition, an independent refining company, and not connected nor affiliated with Prairie Oil & Gas Company, and other large pipe line companies doing a general oil purchasing business in all parts and sections of the Mid-Continent field. That Sapulpa Refining Company was the owner of a single refinery situate at Sapulpa, Okla., of a daily average refining capacity of 6,000 barrels of oil, and that its purchases of oil in the Mid-Continent field were limited to the requirements of its refinery. That Sapulpa Refining Company owned pipe lines extending into the general vicinity of the Loman and Thompson leases described in plaintiff's petition as belonging to it, and into certain other oil producing sections of the state of Oklahoma within a radius of approximately 50 miles of the refinery at Sapulpa. That Sapulpa Refining Company, unlike the large general purchasers of Mid-Continent oil, had no pipe lines extending throughout nor beyond the Mid-Continent field, and was not engaged in the business of supplying refiners beyond the state of Oklahoma with oil for refining purposes, and was not engaged in the transportation of crude oil to coastal refineries. That said Sapulpa Refining Company is capitalized for $_____ and was at the time of the making of the contract and bond sued upon herein, depending for pipe line purchases of oil upon production which could be secured by it from the vicinity of its lines. That the oil produced from the leases owned by it and described in its petition was convenient to the pipe line facilities of the Sapulpa Refining Company, and the purchase of oil produced by plaintiff was solicited by Sapulpa Refining Company for purchase and use in its refinery.

"(8) That prior to the date upon which the contracts sued upon by the plaintiff herein were made, and when production upon on the properties described in plaintiff's petition was first developed, the Indiahoma Refining Company connected to said leases and ran all oil up to the month of September, 1919, at a premium of 25 cents per barrel over the posted market price of said Prairie Oil & Gas Company. That during the month of September, 1919, and about three months after production was first discovered upon the above described leases, the Prairie Oil & Gas Company also connected its lines to and ran oil from the leases of plaintiff as described in its petition, up until the month of January, 1922, paying for oil run by it, the said Prairie Oil & Gas Company, the market price posted by said company for Mid-Continent oil. That the Sapulpa Refining Company, one of the defendants herein, began running part of the oil from the aforesaid leases on September 6, 1919, and continued until December 31, 1920, during which time the said Sapulpa Refining Company paid a premium of 25 cents per barrel for oil run from said leases by it. That upon January 1, 1922, the Sapulpa Refining Company began the running of all oil from said leases pursuant to the

contracts annexed to the plaintiff's peti-
tion and sued upon by plaintiff herein. (9)
* * *"

Disposition of the case depends upon the
interpretation to be placed upon the price-
fixing clause contained in each of the con-
tracts, which reads:

"The oil purchased and received in pur-
suance of this agreement * * * shall be paid
for to the first party or their assigns * * *
at the posted market price per barrel of 42
gallons, on the date the oil is run, paid by
the Prairie Oil & Gas Company, for Mid-
Continent crude, and on account of the
quality of this crude oil the party of the
second part agrees to pay to the party of
the first part, in addition to the Prairie
Oil & Gas Company's posted price, a prem-
ium of 35 cents per barrel."

Section 5046, C. S. 1921, provides:

"A contract must receive such an inter-
pretation as will make it lawful, operative,
definite, reasonable, and capable of being
carried into effect, if it can be done with-
out violating the intention of the parties."

In the interpretation of contracts it is
the duty of the court to ascertain the in-
tention of the parties at the time the con-
tract was entered into, and that intention
must be determined by the language of the
contract itself, if possible.

In the case of Bearman v. Dux Oil & Gas
Co., 64 Okla. 147, 166 Pac. 199, it is said:

"In the construction of contracts, it is
the duty of the court to place itself, as far
as possible, in the situation of the parties
at the time their minds met upon the terms
of the agreement, and from a consideration
of the writing itself, ascertain their inten-
tion, and if this cannot be done from the
instrument itself, the circumstances under
which it was made, and the subject-matter
to which it relates, may be considered, and
with these aids, the court should so inter-
pret the contract as to give effect to the
mutual intention of the parties as it ex-
isted at the time of contracting, so far as
that intention is ascertainable and lawful."

To the same effect: Prowant v. Sealy, 77
Okla. 244, 187 Pac. 235, and Withington v.
Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634.

It is contended by the plaintiff that the
parties to the contract being experienced in
the oil business, and with knowledge that
the Prairie Oil & Gas Company had in the
past posted prices for "Mid-Continent
crude," based upon the gravity of the oil,
they must have had in mind it might again,
during the life of the contract, adopt that
method of price-fixing, and, therefore, it
must be held that it was the intention of
the parties, at the time the contract was
made, that if such changed method of price-

fixing arose, the refinery company would
pay the price quoted by the Prairie Oil &
Gas Company for Mid-Continent crude oil
of like gravity of the oil produced from the
Thompson and Loman leases, and an addi-
tional premium of 35 cents per barrel.

It is argued that, if such had not been
the intention of the contracting parties,
with knowledge of the past method of the
Prairie Oil & Gas Company in fixing prices
for "Mid-Continent crude," based upon the
gravity of the oil, it would have been so
specified in the contract. The defendant
contends that since the Prairie Oil & Gas
Company had posted a single price for
"Mid-Continent crude" for more than 11
years, it would have been written in the
contract if the parties had in contempla-
tion a change to price-fixing on a gravity
basis, and intended, in such contingency,
that the refining company should pay the
quoted price for oil of like gravity, and a
35 cent premium.

We think the latter contention must be
sustained. To sustain the interpretation
contended for by the plaintiff, it would be
necessary to read into the contract the
words "of like gravity," or words of simi-
lar import, not found in the contract. It
is unquestionably true, as argued by plain-
tiff, that under the agreed definition of the
term "Mid-Continent crude," oil of like
gravity to that produced on the Thompson
and Loman farms was "Mid-Continent
crude." But it is likewise true, under that
definition, that any and all oil taken from
the Mid-Continent field was "Mid-Continent
crude," including that of lower gravity than
that produced by plaintiff. So that plain-
tiff's interpretation of the contract necessi-
tates the consideration of the particular
gravity of the oil produced at a time more
than ten months after the contract was en-
tered into. We know of no rule of inter-
pretation of contracts which authorizes the
consideration of subsequent variations in
the quality of the product contracted to be
sold, for the purpose of determining the
intention of the parties as to the price to
be paid in the absence of language in the
contract indicating such intention.

Parties to a contract are bound by its
terms and not by subsequent developments.
Reference to the varying qualities of the oil
produced after the contract was made can
only go to the question of whether the con-
tract was a good or bad one, and not to
the intention of the parties at the time of
contracting.

No better illustration of the evil effects

of considering the value or quality of the product, the subject of the contract, in construing the contract, could be found than this case. The last single price posted by the Prairie Oil & Gas Company for Mid-Continent crude was $1.25 per barrel. Based upon that posted price, November 21, 1922, the refining company paid the plaintiff, including the 35 cent premium, $1.60 per barrel for all oil run on that day. The following day the posted prices based upon gravity of the oil, ranged from 90 cents per barrel for oil below 28 gravity to $1.80 for all of 39 gravity and above. On that same day all oil run from the Loman farm and delivered into the refining company's pipe line was above 39 gravity, and paid for at the Prairie Oil & Gas Company's posted price for oil of that gravity, or $1.80 per barrel, and by the agreed facts it is made to appear that all oil run from that farm November 22nd to December 31st was above 39 gravity. The oil run from the Thompson farm was of lower gravity. November 22nd, the day the method of price-fixing by the Prairie Company was changed, all oil run from that farm was 37.1 gravity, or $1.80 per barrel. All oil thereafter run into the refining company's pipe line from that farm ranged in gravity and price from 34.8, or $1.25 per barrel, to 37.4 gravity, or $1.60 per barrel. November 22nd, by the changed method of price-fixing, the refining company paid $1.80 per barrel for oil from the Loman farm, and, if 35 cents premium be included, $2.15 per barrel, and for oil from the Thompson farm the price paid was $1.60, if the premium be included, $1.95 per barrel, while on November 21st, the last of single price for "Mid-Continent crude," it paid only $1.60 per barrel, including the premium of 35 cents per barrel.

A further answer to plaintiff's contention, that it must have been in contemplation of the parties that the Prairie Oil & Gas Company might return to its method of price-fixing based upon gravity tests, as practiced by that company for some years prior to 1910, is that the statute, section 5049, O. S. 1921, provides that a contract is to be interpreted according to the law and usage of the place where it is to be performed, and we think 11 years constant and continued practice of fixing a single price for "Mid-Continent crude" was a sufficient length of time, when the life of an oil field is considered, to establish such practice as a usage within the meaning of the statute. It is argued that the limited area from which the refining company was required

to secure crude oil for refining purposes and the proximity of plaintiff's leases to its pipe line, are facts to be considered as shedding light upon the intention of the parties. As we understand it, the contention is that the defendant company, in its operation of a single refinery, with limited facilities for getting oil for refining purposes, and to be obtained in competition with other larger refineries, was compelled to pay a premium above the market price in order to operate its refinery. From this it is argued that it must have been the intention of the parties that the premium of 35 cents per barrel, to be paid to the plaintiff, was to be a premium above the market price; and, when the price-fixing medium fixed the price of "Mid-Continent crude" based upon the gravity, the price so fixed became the market price for oil of like gravity, and that the defendant was obligated by its contract to pay the premium of 35 cents per barrel above the price fixed for oil of like gravity.

This theory is negatived by the language of the contract:

"* * * And on account of the quality of this crude oil the party of the second part agrees to pay to the party of the first part in addition to the Prairie Oil & Gas Company's posted price a premium of 35 cents per barrel."

It being specified in the contract that, on account of the quality of the oil, the purchaser agreed to pay a premium of 35 cents per barrel, all other reasons for the payment of the premium must be excluded in construing the contract. Section 5059, O. S. 1921, provides:

"All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded."

This being the statute law of this state, we think that when the quality of the oil was mentioned in the contracts, as the reason for payment of a premium above the Prairie Company's posted price, all other reasons for payment of the premium must be excluded in construing the contract.

No case is called to our attention, and we know of none, where similar facts were involved. We think the case is somewhat analogous to that of an executory contract for the sale of goods, providing that the price to be paid shall be fixed by valuers appointed by them. In such case it is uniformly held, so far as we know, that if the

persons appointed as valuers fail or refuse to act there is no sale. Jones v. Pearce, 25 Ark. 545. Elberton Hardware Co. v. Hawes (Ga.) 50 S. E. 964. In the latter case it is held: .

"Where the parties to an executory agreement for the sale of goods agree that the price to be paid for the property shall be fixed by valuers appointed by them, there is no contract of sale if the persons appointed as valuers fail or refuse to act: and this is true even where one of the parties to such an agreement is the cause of such failure or refusal. 1 Benj. Sales. par. 87: Beach on Sales, par. 213; Tiedeman on Sales, par. 46; Thurnell v. Balbirnie, 2 C. B. 786; Cooper v. Shuttleworth, 25 L. J. Ex. 114; Vickers v. Vickers, 4 L. R. Eq. 529; Milnes v. Gery, 14 Ves. Jr. 400; Wilks v. Davis, 3 Mer. 507; Hutton v. Moore, 26 Ark. 382; Fuller v. Bean, 34 N. H. 290. Where the agreement has been executed by the delivery of the goods, and the purchaser has done any act which prevents their valuation being fixed as the agreement provides, the vendor is entitled in a proper action to recover the value of the goods estimated by the jury. 1 Benj. Sales, par. 87; Beach on Sales, par. 213; Clarke v. Westrope, 18 C. B. 765; Humaston v. American Telegraph Co., 20 Wall. 20, 22 L. Ed. 279; Smyth v. Craig, 3 Watts & S. 14."

We think when the Prairie Oil & Gas Company, the price-fixing agency named in the contract, ceased to post a single market price for "Mid-Continent crude," as was its custom when the contract was made and for 11 years prior thereto, the contract ended, for the reason that the price to be paid could not be determined from the contract.

It necessarily follows that the plaintiff cannot, in a suit on the contract, recover the premium provided in the contract on oil delivered subsequent to the change in price-fixing by the price-fixing agency. The trial court so held, and the judgment is affirmed.

By the Court: It is so ordered.

Note.—See 40 C. J. p. 1134, §§765-775.